# Exhibit

# A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**DeCOTIIS, FITZPATRICK, COLE & GIBLIN, LLP**
Gregory J. Hazley (Att'y #162622016)
61 South Paramus Road
Paramus, New Jersey 07652
(201) 928-1100 | ghazley@decotiislaw.com
*Attorneys for Plaintiff Megan Schaffer*

| | |
|---|---|
| MEGAN SCHAFFER,<br><br>      Plaintiff,<br><br>v.<br><br>BOROUGH OF PARAMUS; KEN RASCHEN in his individual and official capacity; JOSEPH "JAY" SEXTON in his individual and official capacity; ROBERT KAISER, in his individual and official capacity; ACE ANTONIO, in his individual and official capacity; JEANNE WEBER, in her individual and official capacity; WILLIAM R. COMERY, in his individual and official capacity; HECTOR OLMO, in his individual and official capacity; JOHN DOES 1-10;<br><br>      Defendants. | Hon. Brian R. Martinotti, D.J.<br>Hon. Michael A. Hammer, M.J.<br><br>DOCKET NO. 2:23-cv-00530-BRM-MAH<br><br>CIVIL ACTION<br><br>**FIRST AMENDED<br>VERIFIED COMPLAINT<br>AND JURY DEMAND** |

   Plaintiff, Megan Schaffer, by way of the First Amended Verified Complaint against defendants Borough of Paramus, Joseph "Jay" Sexton, Robert Kaiser, Ace Antonio, Jeanne Weber, William R. Comery, Hector Olmo, and John Does-10, states as follows:

#3305947

## THE PARTIES

1.      Plaintiff Megan Schaffer is a 36-year-old adult female individual who resides at 220 Hillside Road, Linden, New Jersey.  At all relevant times, Ms. Schaffer was an employee of the Borough of Paramus.

2.      Defendant Borough of Paramus is a municipal corporation organized and existing pursuant to the laws of the State of New Jersey with a principal place of business at 1 West Jockish Square, Paramus, NJ 07652.

3.      Defendant Ken Raschen is an adult male and Superintendent of the Paramus Shade Tree Department.

4.      Defendant Joseph "Jay" Sexton is an adult male and Assistant Superintendent of the Paramus Shade Tree Department.

5.      Defendant Robert Kaiser is an adult male and councilmember and resident of the Borough of Paramus.

6.      Defendant Ace Antonio is an adult male and  councilmember and resident of the Borough of Paramus.

7.      Defendant Jeanne Weber is an adult female and councilmember and a resident of the Borough of Paramus.

8.      Defendant William R. Comery is an adult male and board member of the Borough of Paramus Shade Tree Commission and a resident of the borough.

9.      Defendant Hector Olmo is an adult male and Borough Administrator of the Borough of Paramus.

10.      Defendant John Does 1-10 are unknown, fictitious parties to be determined in discovery.

#3305947

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the above-captioned matter because the defendant public entity is located and conducts business in Bergen County, New Jersey.  In addition, the specific events that form the basis for this lawsuit occurred in Bergen County, New Jersey, and all of the material facts alleged herein occurred in New Jersey.

## FACTS APPLICABLE TO ALL COUNTS

12.     The Borough of Paramus owns various parks, recreation facilities and green spaces, and maintains thousands of trees and other greenery along Borough streets and property. Maintenance duties are apportioned among the Recreation Department ("Recreation"), Shade Tree & Parks Commission ("Shade Tree"), and Golf Commission ("Golf").

13.     From 2019 to 2023, Plaintiff was the Director of Recreation for the Borough, after serving as Assistant Director since June 2018 and applying for the Director position.

14.     Plaintiff is a member of the Paramus Supervisory Employees Association.

15.     In December 2020, Borough Administrator Joseph D'Arco approached Plaintiff regarding the potential for the Recreation Department to take over the Turf Division, which entailed additional duties including managing park maintenance staff, scheduling maintenance work for playgrounds, playing fields, and park landscaping, among other duties.

16.     Plaintiff, having more than 12 years' experience supervising park maintenance staff and a park maintenance crew member, accepted the opportunity.  No additional compensation or funding was provided to Plaintiff or the Recreation Department.

17.     As of January 1, 2021, Plaintiff was at Step 3 of the governing salary guide and earning a salary of $94,291.

#3305947

18.     Plaintiff was subsequently assigned additional duties include management of ten (10) baseball fields, four (4) soccer fields, and three (3) lacrosse fields, along with maintenance duties for property around the fields.

19.     In apparent recognition of this increased responsibility, Plaintiff was moved to Step 2 on the new salary guide, earning a salary of $99,826.74, or an increase of $5,337.74, effective April 1, 2021.  While her salary was increased, there was no formal recognition for the additional responsibilities and her salary remained below the level of similarly situated male employees.

20.     By comparison, the Golf Superintendent, Andrew Schuckers, in 2020, was charged with maintenance of three (3) additional parks, was moved to Step 5 on the salary guide, and received a salary increase of $8,710.74 and total salary of $136,255.52.

**A.  Hostilities from Shade Tree Department**

21.     In or about early 2021, D'Arco asked Plaintiff to draft a park maintenance plan under which the responsibilities of the Recreation Department and Shade Tree Department were split with a goal to eventually transition responsibilities under the Recreation Department.

22.     Plaintiff compiled a proposed plan, which D'Arco reviewed and then sent to the Shade Tree Department for review.

23.     Plaintiff, Kyle Van Haasteren, Assistant General Manager of Golf, Joseph Sexton, Assistant Superintendent of Shade Tree, and Ken Raschen, Superintendent of Share Tree, met to discuss the proposed plan.  Both Sexton and Raschen showed their displeasure that they were not involved in the initial composition of the plan.

24.     The plan presented had the Recreation Department focusing mainly on playing fields and playgrounds, and the Shade Tree Commission maintaining shrubs and mulch beds, as well as some smaller parks.

- 4 -

25. Shade Tree disagreed with this plan and insisted that Recreation take on the trimming of the shrubs and mulch bed maintenance at all locations where they maintained the playing fields, as well, with the exception of Petruska Park.

26. Another meeting occurred on February 12, 2021 between Recreation Staff (Plaintiff and Van Haasteren), Shade Tree (Raschen), Borough Administrator D'Arco, Golf Superintendent Schuckers, Chief Financial Officer Sheri Luna, and Mayor Richard LaBarbiera. At the meeting, the Mayor assured that everyone understood that the initial plan was going to be very fluid based on staff being hired, equipment being ordered, and that everyone was to work together for a common goal.

27. On March 1, 2021, the Turf Division was transferred to the Recreation Department.

28. Very quickly into the Spring season, the Recreation parks staff was falling behind due to staffing issues, as well as a lack of available equipment.

29. Two full-time staff were transferred from Golf, as well as two part-time staff, who were slated to become full-time on April 1, 2021 but were not actually approved as full-time until May 15, 2021.

30. Despite the increased responsibilities for Recreation, very little equipment was made available, such as mowers, enclosed trailers, and trucks. The equipment being utilized had to be borrowed by other departments because the funds earmarked for the equipment needed to be approved in the Borough's capital budget.

31. During this period, Plaintiff began to utilize Recreation Trust Accounts to purchase vital equipment, although typical wait times were 10-12 weeks for delivery.

32. In mid-April 2021, Plaintiff reached out to Shade Tree requesting assistance with the trimming of shrubs at the Gennarelli Sports Complex, as it is the largest shrubbed facility in

#3305947

the Borough and Recreation lacked the equipment as well as staff to complete the job. In return for Share Trade's assistance, Plaintiff offered to take a task from them that Recreation could manage with its resources.

33. Raschen from Share Tree responded with criticism and refused to provide assistance. A constant back and forth regarding the maintenance of shrubs and mulch beds went on for the rest of the year. Despite orders from the Borough Administrator to assist Recreation, Shade Tree declined and advised Plaintiff that her staff must do the work for which she requested assistance.

34. In addition to the administrative conflict, staff members of Shade Tree, including Raschen, followed Recreation parks staff and antagonized them by yelling derogatory remarks or criticizing their uniforms. Emails document the unchecked harassment and failure of the Borough and its employees to rein in the abuse.

35. On April 21, 2021, Plaintiff emailed an Updated Field Maintenance Plan to Borough personnel. The next afternoon, April 22, 2021, Raschen responded to Plaintiff's email with criticism of the Plan, advising "[w]e should all stick to the original plan and your staff should understand all that is involved," adding "[t]aking on easier tasks and passing off more difficult ones is not the way to make this transition work."

36. In May 2021, D'Arco advised Plaintiff that a complaint was filed with a Borough union against Recreation staffer Kyle Van Haasteren regarding his work attire. Plaintiff sat down with the union representative, Jay Mastropasqua, and D'Aarco and advised that there is no dress code under the governing collective bargaining agreement or Borough handbook. Nevertheless, all involved worked out guidelines going forward consisting of long pants, boots, and t-

#3305947

shirt/hoodie/long-sleeve shirt.  During that time, t-shirts that Plaintiff had ordered came in, so employees had staff shirts available to them.

37.    A few days later, Mastropasqua called Plaintiff and advised that another anonymous complaint was filed against Van Haasteren. When Plaintiff received the call, Van Haasteren was in her office, dressed as was agreed in the prior meeting days before.

38.    Plaintiff was advised of suspicions that Shade Tree staff were making the complaints to harass Plaintiff and her staff, undermine her authority and call into question her competence.

39.    A month later, two Recreation staffers were on duty at Reid Park in the Borough working on a field when a Shade Tree employee named Glen Suhr called out to the Recreation staffer and asked him if he was dressed to code, an acknowledgment that the frivolous dress code complaints were originating from Shade Tree.

40.    Plaintiff emailed Raschen and Sexton about the prior anonymous complaints and the Reid Park incident on March 26, 2021, asking if they had any issue with her staff and expressing a desire to "put this to rest here and move forward."  Plaintiff received a response from Borough Administrator D'Arco, who called a meeting with Raschen and Plaintiff.

41.    On September 14, 2021, while trying to cooperate with Shade Tree by taking some responsibilities off their plate, Plaintiff via email proposed a meeting to discuss how to facilitate the fall cleanup of Borough parks in the most efficient way.  She did not receive a response.

42.    In November 2021, Borough Administrator D'Arco called a meeting with Plaintiff, VanHaasteren, Sexton and Raschen to discuss the Borough's Park Maintenance Plan going forward.

43.     In that meeting, D'Arco again insisted that Shade Tree maintain shrubs and mulch beds, and that Recreation maintain playing fields, playgrounds, and three additional parks.  All parties left the meeting understanding their responsibilities.

44.     Following the meeting, Plaintiff updated the Borough's Park Maintenance Plan and emailed it to everyone involved.  Plaintiff received no response from Shade Tree.

45.     Over the winter months from 2021-22 the Recreation park staff completed fall cleanups, repaired and serviced equipment, took on park improvement projects, assisted with Recreation responsibilities such as equipment transport, and conducted snow removal operations throughout the parks and golf course.

46.     During the course of the winter, Raschen continually texted Plaintiff during snow events with criticism or self-described "reminders," even though such oversight and criticism was not part of his job duties.

47.     Throughout the entire fall and winter, Plaintiff worked with the DPW Director Guy Picone, as well as Mastropasqua and Deborah Smith to procure two park maintenance vehicles that were approved in the 2021 capital budget.   Unfortunately, available inventory was slim to none, and any vehicle purchased under State contract or co-op was estimated to take 30 weeks for delivery.

48.     Picone advised that the Borough should put together bid specs, go out to bid, and see if any vehicles could be procured sooner than 30 weeks.

49.     Plaintiff placed a request to go to bid on the agenda for the February 22, 2022 Mayor and Council meeting, but was advised the following day that the request was tabled.

50.     On February 23, 2022, Recreation had its February meeting. At the meeting, Plaintiff questioned Councilman Joseph Vartolone, the Recreation liaison for the governing body,

about the posting of bid specs being tabled, and asked him for an explanation.  Vartolone stated that money was very tight in the Borough and that Chief Financial Officer Luna received all requests, which would then be reviewed.  At that time, Plaintiff repeated to Mr. Vartolone: "So you are reviewing all of the Capital Funding that has not been spent yet, even if it was approved from last year?" He stated yes.

51.     The next day, February 24, 2022, Plaintiff emailed both Recreation council liaisons (Vartolone and Robert Kaiser), expressing the importance of the vehicles requested, and asking for an explanation as to why they were being tabled, after they were already approved in the 2021 capital budget.  The explanation received was the same as the evening before: that they wanted to wait until the Borough CFO reviewed all of the capital requests before approving the vehicle request.

52.     The council liaisons did not advise Plaintiff of the actual reason the vehicles were being tabled: because the council was debating whether to move park and field maintenance from Recreation back to Shade Tree.

53.     Advised of this ulterior reason, Plaintiff was surprised as the major change had never been discussed or even mentioned to her, particularly as the fields had been removed from Shade Tree originally because of the poor quality of maintenance they provided.

54.     A resolution to go out to bid for the vehicles was not approved until March 22, 2022.

55.     On March 2, 2022, the Borough Administrator's Assistant, Patricia Smith, asked Plaintiff at Borough Hall if Councilman Kaiser had spoken to her about winterizing park irrigation systems.  After Plaintiff advised Smith that Plaintiff was not aware of any such issue, Plaintiff was advised that someone had told Councilman Kaiser that Plaintiff spent $7,000 on winterizing the

park irrigation systems and that Shade Tree could do the winterization work in-house.  Kaiser had repeated the claim to others, apparently without checking its veracity.

56.   No one from the Borough council, or any other Borough official, ever came to Plaintiff to question the purported excessive expense and Borough employees instead continued to speak poorly about Plaintiff's management skills on the winterization issue and other issues. The same day, Anne Schneider, the Director of the Senior Activity Center, stated to Patricia Smith that she heard there was going to be "big changes" in the Recreation Department, citing Councilwoman Jeanne Weber as the source of the warning.

57.   In a conversation between Plaintiff and Councilman Kaiser, Kaiser noted that Shade Tree has the ability to winterize park irrigation systems with a compressor from DPW. Plaintiff informed Kaiser that she was aware of the false accusation by Shade Tree that she had spent $7,000.00 to winterize the park systems and explained that the amount was nowhere near that amount; indeed, the expense for winterizing irrigations systems in all parks was $2,600.

58.   Plaintiff also advised Kaiser that at no time did Shade Tree advise Recreation of an ability to winterize the irrigation systems utilizing DPW's compressor.

59.   Nevertheless, Plaintiff spoke with her Assistant Director of Park Maintenance , Kyle VanHaasteren, about the possibility of utilizing DPW's compressor to winterize the irrigation systems, and he explained to Plaintiff that the larger irrigation systems require a certain volume of air, at a minimum of at least 100 psi in order to duplicate the volume of water that runs through the system.  He continued by explaining that DPW's compressor would not necessarily produce that pressure, not only taking an extensive amount of time complete the task, but also with no insurance or warrant if a mistake was made while do so, a key consideration where improper

winterization could result in thousands of dollars in damage.  This was confirmed by Eric Fleischmann of Paramount Irrigation Inc.

60.     Plaintiff noted to Kaiser that when bringing in a vendor to perform winterization, they are certified professionals who also inspect the irrigation system for cracks and leaks, test seals, and otherwise assure the job is fulfilled completely. In the event an error occurs, the vendor becomes responsible for any breakdown. If untrained Borough staff performs the task and makes a mistake, Recreation is on the hook for the additional repairs.

61.     Indeed as Borough personnel and elected officials are aware, the Borough Golf Course contracts an outside vendor to winterize the irrigation systems for these very reasons, but no one has criticized Golf personnel for this expenditure nor alleged it represents irresponsible spending.

62.     Once again, Plaintiff was being held to a different standard than  other male department heads.

63.     As time passed, Plaintiff continued to hear rumors of fallacious or false actions or omissions by Plaintiff and Recreation staff – all intended to cast Plaintiff in a negative light and question her competence – that Shade Tree personnel had been reporting to council members, and that these false accusations were openly discussed in at least one public meeting of the Mayor and Council.

64.     In another example, on or about February 23, 2022, Plaintiff made a request to Shade Tree for mulch to be delivered to Sirianni Park, but was advised the next day by Shade Tree that its wood chipper and/or grinder, which creates mulch for Borough use, was out of service and that she would be notified when it was back in use.

65.    On or about March 18, 2022, a Borough resident complained about the appearance of the Parkway Plex, a sports field facility.  In previous seasons, local residents made complaints about the landscape appearance of the Burke Street entrance to the facility.  In response to the resident, who had made such complaints in the past about the same issue, and mindful that the woodchipper was out of service, Plaintiff went to Home Depot and purchased $60 worth of red mulch – fewer than 12 bags – for the entryway to the park near Burke Street.

66.    At the March 22, 2022 meeting of the Mayor and Council, the issue of the so-called irresponsible winterization purchase was discussed, along with the purchase of the mulch, again without any clarification of the actual facts or push-back against the false claims, and without any attempt to contact Plaintiff for context or background behind the distorted allegations.

67.    The day after the meeting, Plaintiff received a phone call from Councilman and recreation liaison Kaiser, who said he wanted to inform Plaintiff, in case Plaintiff wasn't aware, that the Borough makes free mulch available for its operations, and that there was no need to purchase it.

68.    Plaintiff explained to Councilman Kaiser that she had been working at the Borough for four years and was well aware of Borough mulch, but that the last time she requested mulch from Shade Tree (February 23, 2022), she was informed that the woodchipper was broken, and that they would update her when the status changed. No such change in status or update was provided.

69.    At that point, Plaintiff realized that someone had called Councilman Kaiser to report that Plaintiff purchased mulch to make Plaintiff appear fiscally irresponsible or incompetent.

70.    Indeed, Plaintiff asked Councilman Kaiser if someone had called him to tell him that Plaintiff had purchased mulch, and he stated yes, although he was not aware of how much

mulch was purchased. After Plaintiff explained why she had purchased the very minimal amount of mulch, Councilman Kaiser admitted that he would have done the same thing.

71.     In the same conversation, Plaintiff expressed concern to Councilman Kaiser that Shade Tree would have had to have been following her and inspecting the parks in order to know that she had purchased the minimal amount of mulch.

72.     Notably, in mid-April, while driving past the Borough Golf Course, managed by an all male commission, Plaintiff observed approximately 15 yards of black mulch purchased from an outside vendor at a cost of $1,312.00, substantially more than the amount for which Plaintiff was questioned and for which no complaint was made or raised.

73.     The winterization and mulch issues were part of a pattern of harassing behavior by Shade Tree personnel against Plaintiff, who lodged bogus or trumped-up complaints to elected officials about Plaintiff to undermine her position and create doubt about her abilities, while making no such complaints or allegations about her male counterparts.

74.     Prior to the parks being moved to Recreation, Borough baseball/softball fields were under the direction of the Golf Superintendent, Andy Schuckers, a middle-aged male, who was performing the same duties as Plaintiff, purchasing the same items, and utilizing vendors to do the same tasks; yet the accusations directed at Plaintiff were never made toward him.

75.     On March 4, 2022, Plaintiff emailed Shade Tree Director Raschen that she saw his staff at Petruska Park (a park where Shade Tree has always maintained the landscaping) and that it looked great.  Plaintiff asked if Raschen could let her know when his staff would be visiting other parks to trim the shrubs and maintain the mulch beds so that Plaintiff could assure winter cleanups were completed as per the November 2021 agreed-upon Park Maintenance Plan. Raschen ignored the email and never responded.

#3305947

76.     On March 9, 2022, Plaintiff was notified of a large issue with a well pump at the Parkway Plex Park that had a direct impact on the irrigation system not working at full capacity. Plaintiff emailed Shade Tree and DPW asking if they had any vendor recommendations, so that she could get more quotes for the job.  Rather than assisting in any way, Raschen stated, "Jay [Sexton] designed the original system. I question why Kyle [Van Hassteren] did not reach out to us for help troubleshooting."

77.     On March 23, 2022 Plaintiff met with new Business Administrator Hector Olmo and grant writers about some park projects. After the meeting, Plaintiff asked Olmo if she could speak to him privately.

**B.  Plaintiff Details Campaign of Harassment**

78.     During the subsequent meeting, Plaintiff and Olmo discussed all of the ongoing accusations by Shade Tree, the ongoing harassment, and the council's possibility of moving park responsibilities. Olmo stated that Plaintiff was being given the opportunity to "prove" herself and her staff's abilities.

79.     Plaintiff explained to Olmo of the conflict over the past year in regard to shrubs, mulch and a lack of staff and equipment. He stated that Plaintiff and her department were being given the opportunity to do the job and the Borough would "see how it goes."

80.     Plaintiff repeatedly advised Olmo that if Shade Tree wants control of the parks that badly, and if Plaintiff and Recreation staff are going to be harassed again this year or continually held to a different standard, then Shade Tree can have the parks and Plaintiff will return to directing Recreation as it was before the transfer.

- 14 -

#3305947

81.     On March 28, 2022, Plaintiff received an email from Borough Administrative Assistant Patricia Smith requesting a meeting with Plaintiff and Shade Tree Director Raschen for the next morning at 9:30AM.  Plaintiff and Raschen both agreed.

82.     On March 29, 2022, Plaintiff attended a meeting at Borough Hall with Borough Administrator Olmo, Councilman and Recreation liaison Kaiser, Councilman and Shade Tree liaison Ace Antonio, along with Raschen and Sexton.  Notably, Sexton was not invited to this meeting but showed up and was admitted.

83.     During the meeting, the administration advised the parties in attendance that the purpose was discuss the current park maintenance plan and to ensure that the work was getting done, regardless of who was doing it.

84.     During the meeting Raschen criticized Recreation and Plaintiff for purportedly changing the field plan multiple times and, unsolicited, touted the experience he and his assistant (Sexton) had in complaining that they were not included in the initial planning process.

85.     Asked what his issue was with the then-current plan in place (dated 11/9/21), Raschen stated that he did not want his department (Shade Tree) to be responsible for cutting shrubs or mulching parks where Recreation was maintaining playing fields at the same location. He made it clear he wanted nothing to do with Plaintiff or her department.

86.     Plaintiff politely advised all in attendance that she was willing to do whatever job duties that she was directed to do, but noted Recreation did not have the equipment to do such work while Shade Tree already owned and used the equipment for that very purpose. She also stated that Shade Tree utilized its tree trimming crew to maintain the shrubs in parks, and not their park management staff, which provided more assistance.  Raschen responded dismissively that Plaintiff's remarks were "irrelevant," criticized her staff and her leadership of same, including

#3305947

- 15 -

questioning why Recreation did not maintain certain parks over the winter, and stated that landscape areas in the parks under Recreation looked "terrible." Plaintiff stated that the field plan agreed upon on 11/9/21 required Shade Tree to be responsible for the shrubs and mulch beds at all parks and noted Recreation staff was not responsible for such duties and would not have done them over the winter.  As such, Raschen's criticisms were not only unprofessional, but they were flat out erroneous.

87.     Councilman Kaiser spoke up and called Raschen out on the fact that he blatantly disregarded the field plan with assigned job duties agreed upon in November simply because Raschen did not now like the plan.  Kaiser noted that Raschen was trying to make it appear to everyone in attendance that Plaintiff and her staff were not doing their jobs properly, when in reality, he was misstating facts and lodging false criticism for work that was not their job to do.

88.     Raschen did not address the correction of his falsehoods and stated only that Shade Tree staff was busy with other items.

89.     Also during the meeting, Sexton made Plaintiff aware for the first time that the mulch chipper was now in working order.  As such, Plaintiff requested 15 yards of mulch to be delivered to Sirianni Park.

90.     Despite the unfounded criticism, the meeting concluded with Plaintiff stating that she would take back the shrubs and mulch because she did not find it necessary to argue over job duties and that she was willing to do whatever is asked of her by her superiors.

91.     As the meeting ended, Plaintiff was preparing to leave, when Olmo asked her to stay.  After Shade Tree staff left and Plaintiff remained with Olmo, Kaiser, and Antonio, the three men commented that Shade Tree was blowing the shrubs and mulch issue out of proportion, stated

that the meeting was "ridiculous" and could have been sorted out in an email, and they thanked Plaintiff for being so accommodating.

92.     Plaintiff explained to them that she did not ask for the additional park responsibilities, and when she agreed to them, certainly did not agree to being followed, harassed, and defamed by Shade Tree personnel.  She stated that the things that Shade Tree personnel were taking pictures of, or going around telling people that Plaintiff was doing, were either untrue or no different than what other department heads were doing with no repercussions or complaints.

93.     Before leaving Borough Hall, Plaintiff spoke with Kaiser and Olmo one last time, where she expressed that she had no issues taking on the shrubs and mulch maintenance going forward, but that she did not feel as if it was right that her staff would be responsible for doing the work that Shade Tree chose not to do all winter because they did not like the plan.

94.     Plaintiff noted that she had five (5) full-time staff, while Share Tree had more than three-times as many.  Recreation had no vehicles while Shade Tree had a dozen.

95.     Olmo and Kaiser agreed and asked Plaintiff to send Olmo a list of parks that Shade Tree was responsible for over the winter and chose not to maintain.  Plaintiff sent the list to Olmo when she returned to her office that day.

96.     On Thursday, March 31, 2022, Plaintiff underwent major shoulder surgery and spent the weekend recuperating and unavailable.

97.     By Monday, April 4, 2022, Plaintiff was able to begin moving better, check emails and do some work from home.  It was at that time, that Plaintiff noticed an office voicemail and email from Councilman Antonio, asking her to call him. She emailed him immediately, advising the Councilman that she had shoulder surgery but was available to speak when he was free.

#3305947

98.     Antonio called Plaintiff shortly after and explained that he was calling to apologize. When Plaintiff asked what he was apologizing for, he stated that he was apologizing that Plaintiff had to deal with Shade Tree and everything that had to do with the meeting last week.

99.     During the near hour-long conversation, Antonio advised Plaintiff that Shade Tree had been working for months, since November, to return parks back in their purview by repeatedly criticizing Plaintiff and her staff.  He noted Raschen or his staff had sent councilmembers scores of photos of Recreation department work in a bid to undermine and improperly cast doubt on Plaintiff's performance.

100.    Antonio noted that Raschen contacted Councilman Kaiser as early as 5 a.m. on certain days to complain about Recreation work directed by Plaintiff.  He noted that even after the March 29, 2022 meeting, Raschen emailed Antonio and Councilwoman Jeanne Weber that Shade Tree should get the parks back, ostensibly due to Plaintiff's failures.

101.    Plaintiff explained to Antonio that she and her department were set up to fail from the start by being assigned park duties without proper equipment or staff and that when she reached out to Shade Tree for assistance, they ignored requests or provided criticism and limited, if any, assistance.  She noted Shade Tree staff followed Recreation employees and harassed them for a year, and made various false accusations about Plaintiff and her job performance.  She advised Antonio that she was tired of being harassed, discriminated against, and defamed.

102.    Antonio agreed with Plaintiff and told her she had every right to feel as she did.  He noted that if Raschen and Sexton worried more about their actual responsibilities than Plaintiff's, the Borough would receive fewer complaints.

#3305947

103.     Plaintiff advised Antonio that if Shade Tree wanted the parks back so badly, they could have them because she could not work under the existing conditions and the months-long campaign of harassment any longer.  He advised Plaintiff that the issue would be handled properly.

104.     On the morning of April 6, 2022, Plaintiff received a phone call from Councilman Kaiser, who noted that after the March 29 meeting, Raschen and Sexton undermined Kaiser and Olmo by emailing Councilwoman Weber and Councilman Antonio that Shade Tree needed to get the parks back due to Plaintiff's alleged failures.  Raschen was unhappy with two things from the meeting: (1) that Kaiser called Raschen out in the meeting about ignoring his responsibilities over the winter because Raschen did not agree with the plan, and (2) that Olmo directed him to complete the tasks that Shade Tree chose not to do in the winter.

105.     Plaintiff told Kaiser that she "had enough."  She noted that when she agreed, on request, to take on the parks responsibilities, she had not agreed to be harassed daily and held to a different standard than everyone else.

106.     Kaiser said he did not want to give the parks back to Shade Tree because Raschen complained enough to get them back, and that Shade Tree could not even handle their own department responsibilities.  He added that he had been advised that Raschen, Sexton, or someone else from Shade Tree, was going to be attending the Mayor and Council meeting that evening.

### C.  False Allegations Aired Before Mayor & Council

107.     The next morning, Plaintiff received a phone call from Mayor LaBarbiera, who asked Plaintiff if she had spoken to her council liaison yet, to which Plaintiff advised him that she had not.  She asked the Mayor what happened at the meeting the night before.

108.     LaBarbiera told Plaintiff that Shade Tree Commissioner William Comery spoke during the public session of the meeting as a "concerned citizen" and ranted about Recreation/parks

#3305947

staff and Plaintiff's leadership, making several false accusations regarding paid overtime (when no overtime was incurred or paid), ripping out a $1,500 rose bush purportedly because Recreation didn't want to take care of it, alleged unsafe playground conditions that he said he witnessed when he and Raschen were out marking trees and sua sponte decided to measure the levels of mulch on Recreation playgrounds, as well as other de minimus and distorted issues that only Raschen and Plaintiff had discussed in emails but that had reportedly been shared with others by Raschen and were now being discussed in a public meeting.

109.    Comery stated in the public meeting that no one is qualified to do the job in Recreation and that Plaintiff's staff was not supervised.

110.    Alarmed by the false allegations made at a public meeting, including the content of internal emails, Plaintiff immediately sent a message to Councilman Kaiser, who called her.  She again expressed very strongly that she no longer wanted park responsibilities and everything that came with it, including the harassment, defamation, bullying, discrimination and hostile work environment that had been ongoing for a year.

111.    Comery's comments, although purportedly made as a concerned citizen, exhibited personal knowledge of email communications between Plaintiff and Shade Tree and attempted to distort several simple issues and make false statements to portray Plaintiff and the Recreation Department under her leadership in a negative light.

112.    In the conversation, Plaintiff told Kaiser that she was being treated unfairly and being held to a different standard than other department heads.  She noted the Shade Tree unit was the most complained-about department in the Borough by the public, its personnel ignored their winter park responsibilities claiming to be too busy, and yet spent hours monitoring and surveilling the work that Plaintiff was doing. No one from the Borough rebuked Shade Tree staff, told them

to stop, or held them accountable in any way for their actions against Plaintiff or their own failures to complete tasks.

113.    On the flip side, Plaintiff was being subjected to intense scrutiny – questioned and criticized by Shade Tree, and consequently by Borough officials, about most decisions she made and the actions she took in the Recreation department.

114.    Kaiser acknowledged to Plaintiff that she was being treated unfairly and confirmed that the only complaints about her and her department were arising from Shade Tree.

115.    Plaintiff advised Kaiser that she would be filing a grievance for these actions, and he responded by telling her that he didn't think that was necessary because they were going to handle it.

116.    Plaintiff advised Kaiser that if she was a 55-year-old male sitting behind a desk, Shade Tree would not feel empowered (and unfettered) to question her abilities and qualifications, and the council would not be listening and validating the criticism.  She advised Kaiser that she was being held to a different standard because she was female.

117.    Plaintiff also told Kaiser that she wanted the opportunity to speak the truth to the accusations made to the council and he recommended that Plaintiff put her response in a brief email – he stressed that it should be short in length – rebutting the phony claims.

118.    Plaintiff drafted a rebuttal to the fallacious and false charges and emailed it to Kaiser and Olmo.  But no one responded to the email and it was never shared with the rest of the council, as requested.

119.    Kaiser's instruction to keep her response brief and attempt to dissuade her from filing a grievance made it clear to Plaintiff that he did not want her to elaborate on her feelings of

harassment, bullying and intimidation.  She believes that because she did include such information, the email was never shared.

120.    Over the next few days, Plaintiff had phone and text interactions with Councilman Antonio in which he expressed that the conflict needed to be resolved and that the Borough was going to do everything that they could to resolve the issue.

121.    Antonio advised Kaiser that if Plaintiff felt she needed to file a grievance, that she should.  Antonio stated that it was well overdue and he probably would have filed one already.

122.    On Friday, April 8, 2022, Plaintiff received a call from Councilman Antonio in which he asked Plaintiff to send him every single piece of paper Plaintiff had in regard to the transition of parks. He stated that he was going to spend the weekend reviewing everything in order to come up with some type of solution that is best for the Borough.

123.    Plaintiff agreed and emailed him later that night.

124.    Shortly after the phone call with Antonio, Kaiser called Plaintiff and told her that he believed the issue was solved.  It was clear to Plaintiff that the two councilmen did not communicate with one another because Kaiser said that he and Administrator Olmo had just met with Shade Tree for more than two hours, putting them "in their place," and telling them to worry about their jobs, and their jobs only.  Kaiser said they advised Shade Tree to leave Plaintiff alone, and ordered them to do the work that they did not do the prior weekend.  Kaiser assured Plaintiff "they got the message."

125.    When Plaintiff told Kaiser that she still planned to file a grievance, he reiterated that "they got the message" and would not be bothering Plaintiff anymore.

126.    Kaiser continued by telling Plaintiff that he did not think that Raschen told Comery any of the information Comery shared at the public council meeting, because when it was addressed, Kaiser said that Raschen seemed "embarrassed" that Comery said any of those things.

127.    Plaintiff advised Kaiser that Raschen was the only one who could have shared the email information with Comery – the emails were solely between Plaintiff and Raschen – and that Comery stated that Raschen was with him when they were measuring the playground mulch. Plaintiff suggested to Kaiser that Raschen was embarrassed because Comery publicly spoke the lies Raschen told him about Plaintiff and now they were being called out and proven to be untrue.

### D.  Plaintiff's Grievance is Filed and Ignored

128.    On April 12, 2022, Plaintiff filed a grievance with Administrator Olmo and union representative Cynthia Holmes detailing harassment and the hostile work environment she faced. Both responded that the grievance was "received."

129.    Also on April 12, 2022, prior to sending the grievance, Plaintiff sent Olmo a list of equipment that was needed for Recreation to take on the new responsibilities of shrub trimming. Olmo did not respond to the email.

130.    When Plaintiff later saw Olmo in person, she asked about the equipment email and he advised her that if Recreation had the money in its budget to purchase it, then Plaintiff should do so. Plaintiff explained that she did not, but that she was given additional job duties that require the equipment, and that she would have to take the money from a Borough trust account.

131.    Over the next ten (10) days, Plaintiff spoke with Administrator Olmo several times. During those encounters, the situation with Shade Tree was casually mentioned on multiple occasions but no formal interview was ever conducted.  Plaintiff expressed to Olmo that she

#3305947

wanted the incidents to be documented and acknowledged, and for Shade Tree to be held accountable for their actions, so that if they continued to occur, there was a documentary record.

132.   On multiple occasions, Olmo stated that Plaintiff's department was being given the opportunity to "prove" itself.

133.   As to the Shade Tree harassment, Olmo nonchalantly agreed with Plaintiff and laughed about how ridiculous the issues were; he stated that he just wanted everyone to worry about the jobs they are assigned to do. Olmo's attitude struck Plaintiff as very similar to when Shade Tree left the meeting on March 29, and everyone mocked their behavior, acknowledging how wrong it was, yet doing nothing about it.

134.   Plaintiff reiterated to Olmo that she was tired of being harassed, treated differently, and that if she was a middle-aged man, she would not be facing the issues she faced daily.

135.   On April 26, 2022, after the 10-day period to respond to Plaintiff's grievance had passed, union representative Holmes emailed Plaintiff and Olmo, asking for the status of Plaintiff's grievance, because Olmo had not yet responded.

136.   Olmo called Plaintiff's office and stated that he had "misunderstood" her email, and thought that she was just sharing her intentions of filing a grievance, not that, it was her actual grievance.  He nevertheless went on by stating based on Plaintiff's union contract the next step would be to bring it to the Mayor and Council, and now that he had exceeded the 10 days to respond, Plaintiff had every right to do so.

137.   Plaintiff explained to Olmo that she recognized that Olmo said it was a misunderstanding.  She advised him that she would prefer for it not to go to Mayor and Council and instead allow him the time to proceed at Step 1, and restart the 10 days to respond.

138.    Olmo agreed to that course and to respond to the grievance to union representative Holmes.

139.    Olmo then responded to Holmes that he misunderstood the purpose of Plaintiff's grievance email and had not done an official investigation, but that he had spoken to everyone involved "unofficially."  He also acknowledged that without Plaintiff filing a grievance, that he recognized there was an issue at hand.

140.    Plaintiff responded by stating what she and Olmo had discussed, and the 10-day period of Step 1 commenced anew.

141.    In the meantime, Plaintiff felt the need to keep Olmo and Kaiser updated on the status of the parks so that when Shade Tree continued to question Plaintiff and her staff's actions, they were ahead of it.

142.    At some point Olmo asked Plaintiff to send him any reports from the Certified Playground Inspector that Plaintiff brings in annually to assure to safety of all Borough playgrounds.  She sent the then-current report, which showed all playgrounds were satisfactory and only needed some additional mulch for "aesthetics." Plaintiff also included a list of parts that needed to be replaced.  She received no response.

143.    On April 27, 2022, Olmo called Plaintiff's office and asked if she had a resume that she could send him so that he could "knock the wind out of some sails." When Plaintiff asked what her resume had to do with the wind in anyone's sails, he explained that he was trying to discredit Comery and his accusations.

144.    Plaintiff reminded Olmo that Comery told the council in a public meeting that Plaintiff was "draining" an overtime account, an outright lie that was easily debunked by

documentation and that Olmo had discredited himself. Olmo acknowledged Plaintiff's statement and ended the call.

145.     Plaintiff was dismayed by the call and did not feel the request for her resume and Olmo's stated purpose to address Comery's claims was appropriate, particularly in the short period after Plaintiff filed a grievance relating to the matter and particularly in light of the extended campaign of harassment questioning her credentials and stewardship of the Recreation Department.  Nevertheless, Plaintiff, recognizing that she should heed a request from the Borough Administrator, sent Olmo her resume on April 28, 2022.

146.     Throughout the month of April, mainly after she filed her grievance, Plaintiff received daily texts or calls from Councilman Kaiser about items needing repair at parks, items that he claimed came from residents but were originating from Shade Tree personnel.

147.     On one occasion, Kaiser met Plaintiff at Mele Park to show her "mold" on a playground – it was not mold, but residue from leaves fallen from a tree – and to advise Plaintiff that mulch needed to be put into the playground.  Plaintiff reminded Kaiser that she already made the mulch request as indicated in her weekly report that she had already provided to him, and which he said was helpful.

148.     The same day, Kaiser texted Olmo a picture of a crooked baseline on a baseball field and asked him to ask Plaintiff to fix it, an odd request that, to Plaintiff, was the latest in a campaign of small issues raised by Shade Tree personnel under Raschen that constituted continued harassment and questioning of Plaintiff's qualifications.

149.     On May 5, 2022, Olmo informed Plaintiff that he spoke to the joint insurance fund and requested a risk assessment on Borough playgrounds.  Plaintiff advised Olmo that she had a playground inspection on March 16, had emailed him the list of playground equipment that needed

to be replaced, and that he did not respond the email.  Olmo stated that the assessment would just be another check, so that the Borough had a baseline risk assessment.  Plaintiff asked Olmo to provide her the most recent and any past risk assessments that had been done while Share Tree had the responsibility for the playgrounds and he could not.

150.    On Friday, May 6, 2022, Olmo emailed Plaintiff and advised her that her grievance had been denied based on the following: "I have reviewed the allegations contained in the e-mail and have also reviewed both the notes of the meeting referred to therein as well as the audio recording. At this time, I am denying the grievance at Step 1 of the grievance procedure."

151.    On Monday, May 9, 2022, the joint insurance fund emailed Plaintiff to set up a date for the playground inspection, but after Plaintiff confirmed the date and noted the March inspection, the fund responded that the risk assessment was not necessary due to the recent inspection.  Olmo intervened in the email conversation to say he was a new administrator and wanted a new "baseline" assessment, even though the insurance fund had said it was superfluous.

152.    On May 10, 2022, Plaintiff filed to take her grievance to Step 2 of the grievance process, under which the Mayor and Council and/or its designate shall host a meeting within 30 days and a response shall be given within 20 days.

153.    On May 12, 2022, Plaintiff sent an email to Kaiser and Olmo to update them on parks and inquiring whether Shade Tree would be fulfilling the maintenance duties that they neglected all winter, including thorn bushes at Parkway Plex that were overgrown and dangerous to those using the park, and public garbage receptacles that were not being emptied. Plaintiff received no response.

154.    Later that day, Plaintiff was notified by Van Haasteren that a Share Tree employee, Chris Petronzio, was on the baseball fields at Petruska Park, taking pictures of the facilities.

Plaintiff walked to the park and observed Petronzio as reported.  Plaintiff immediately texted Council Liaison Kaiser about the incident and he responded saying he did not hear anything about it.  Subsequent emails from Plaintiff to the administration about reoccurring incidents like this or where Shade Tree staff harassed Recreation staff, received no response.

155.    On May 20, 2022, after Plaintiff sent an email expressing to the administration and Council the continued harassment she faced, Councilman Antonio visited her office to "check on" her.  During the visit, he acknowledged the unfair treatment and stated in front of Recreation Leader Daniel Conte that he has told Councilwoman Jeanne Weber to stop taking rides to the parks with William Comery to highlight imperfections in Plaintiff's work.

156.    On May 26, 2022, Councilman Antonio visited the Borough pool where Plaintiff was working with Assistant Director Ed Grill and Recreation Leader Daniel Conte.  Antonio advised Plaintiff of another recent attempt by Shade Tree personnel to discredit Plaintiff's work by taking photos and reporting a purported unsafe basketball hoop to the councilman, rather than to Plaintiff or her department.  Councilman Antonio advised Plaintiff that he would file another grievance if he was her and would continue to do so until someone listened.

157.    On or about the same day, Shade Tree advised Councilman Antonio that Plaintiff was responsible for putting up road signs announcing the Borough's Fourth of July celebration and that her department had failed to do so.  Plaintiff advised Antonio and Olmo via email that the signage was never her or her department's responsibility and that, in any event, Recreation did not possess the bucket-truck and lift equipment to do so.

158.    On June 9, 2022, Plaintiff received a "Rice" Notice stating that the Mayor and Council may discuss her employment at its upcoming June 14, 2022 meeting, or five days after the 30-day time period for a meeting under the contract.

- 28 -

159.   Plaintiff responded to the Rice Notice the same day with a request that any discussion of her employment be held in closed session, requesting permission to attend the closed session with counsel, and requesting that the closed session be recorded.  She did not receive a response.

160.   Without any response, Plaintiff reached out to the Borough clerk seeking a response to her requests regarding the Rice notice.  It was still not clear to Plaintiff why she was being sent the Rice notice and/or if it was to host a hearing on her grievance complaint.

161.   On June 10, 2022, Borough counsel via email advised the Borough Clerk and Borough Administrator that "[i]t will be up to the governing body to determine how they want to conduct the review of the grievance," adding that "[t]he governing body may allow the grievant to be in attendance but is not required to," and that "[t]he governing body may allow the grievant to speak, but is not required to."  He advised that the closed session would not be recorded "as that is not required under the law, only that reasonably comprehensive minutes are kept."

162.   That same day, Olmo called Plaintiff and requested that she stop by his office.  In the ensuing meeting, Olmo made several contentions for the first time:

a.   that Plaintiff's union representative came to him regarding Plaintiff's grievance hearing on June 14.

b.   the reason he never contacted Plaintiff to request an extension was that he is not supposed to communicate with a grievant during the grievance process and could only communicate with the union president.

c.   he was under the impression that the union representative was in contact with Plaintiff; so Olmo himself never contacted Plaintiff.

#3305947

      d.     the union president Holmes advised Olmo that a five-day extension on Plaintiff's grievance process was okay.

158.    Plaintiff reminded Olmo that she filed the grievance, not the union, and per the contract she was the only person who could agree to the terms of an extension.

159.    Notably, and as Olmo was well aware, union representative Holmes is the representative for both Plaintiff and Raschen, presenting a conflict of interest in acting on either party.

160.    On June 10, 2022, Olmo emailed Holmes asking for confirmation that she agreed to a five-day extension for a grievance hearing to be held on June 14, 2022.  Holmes immediately went to Olmo's office and told him she had never agreed to such an extension and that she assumed Olmo had spoken to Plaintiff about the purported extension and that it was agreed upon.

161.    Holmes also noted to Olmo that there was never any formal request for an extension nor any formal notification of a grievance hearing.

162.    Despite the five-day extension, the 30-day period to hold a hearing under Step 2 had already expired.

163.    Plaintiff advised Olmo that she had not been contacted by Holmes at any time.

164.    At no time did the Borough conduct a hearing on Plaintiff's grievance.

165.    On June 13, 2022, counsel for Plaintiff advised the Borough that it was representing her with regard to her grievance.  Counsel for the Borough via letter dated June 14, 2022 responded and advised Plaintiff through counsel that the grievance was not answered by the Borough and is therefore deemed denied under the collective bargaining agreement. The Borough had made no effort to investigate the allegations of Plaintiff's grievance as to harassment and hostile work environment.

#3305947

166.    Two months later, on or about August 9, 2022, counsel for the Borough contacted Plaintiff and said it was in reference to her "complaint."  Plaintiff advised Borough counsel that she was represented by counsel – the Borough was already on notice of this – and referred her to her counsel.

167.    Prior to this, Olmo asked to meet with Plaintiff and informed her that Borough counsel would be reaching out to begin an investigation on my complaint.  When asked why it was taking place months after the grievance was denied, Olmo stated that they could not conduct an employee complaint investigation sooner due to grievance procedure and an unexplained "conflict of interest."

168.    Asked for clarification, Borough counsel advised that it was investigating Plaintiff's "complaint."  When asked for a copy of the complaint to which counsel was referring, counsel produced Plaintiff's April 12, 2022 grievance email and highlighted certain portions of it relating to allegations of a hostile work environment, interference, intimidating and hostile acts.

169.    On August 9, 2022, Plaintiff was asked to attend a meeting with Councilman Kaiser and Administrator Olmo.  She attended with Assistant Director Grill and upon arrival Councilman DiPiazza was also in attendance.

170.    During the meeting, Olmo proposed the "temporary" transfer of three Recreation maintenance workers to Shade Tree.  Plaintiff suggested an alternative for the two departments to collaborate that didn't require transfers; all present agreed that the compromise was reasonable and Olmo would talk to Shade Tree.  Plaintiff never heard about the issue again and when she followed up did not receive a response.

171.    Also during the meeting, Olmo proposed transferring the Borough Pool to the Recreation department as the DPW Director no longer had time to oversee the pool.

172.     Plaintiff researched the pool operation requirements and, the next day, emailed Olmo setting forth the amount of work and additional responsibilities, meeting and after-work hours that oversight of the pool would require.  Plaintiff advised she would be happy to discuss the transfer as long as her salary was adjusted to match other (male) department heads who took over subdivisions in their departments, and included a list of such department heads and their salaries.  She never received a response.

173.     Amid the backdrop of years of harassment and hostile work environment, and with the Borough initially ignoring her formal complaint and later dawdling on its follow-up, Plaintiff resigned effective November 18, 2022.

174.     The vitriol and intimidation against Plaintiff did not end with her resignation, however. After Plaintiff served the instant Complaint on the Borough and certain defendants, an agent for the Borough sent a group text message on or about January 3, 2023 to Mayor DiPiazza and Plaintiff, stating, "Let us bury Megan.  I want this case."

175.     Plaintiff viewed the message as a threat and a continued effort by the Borough to harass and intimidate her.

176.     The agent in a subsequent message to Mayor DiPiazza and Plaintiff, attempted to downplay his intimidating message by suggesting it was an inappropriate joke.

177.     In all, Plaintiff was defamed, harassed, discriminated against, left to work in a hostile work environment by the neglect of the Borough administration and Council, who failed to do their part in protecting Plaintiff as an employee and, in various instances, took part in the continued harassment and discrimination themselves that continues to this day.

178.     Borough personnel did everything and anything that they could to make Plaintiff and her staff appear incompetent. The Borough Council and administration accepted false and

#3305947

demeaning remarks about Plaintiff and her competency and, as result, held her to a higher standard than the middle-aged male department heads.

179.    When Plaintiff filed the grievance that Councilman Kaiser suggested was "unnecessary," Borough officials made a conscious decision that they would allow the harassment to continue and embarked on their own path of making Plaintiff's work environment hell in a bid to force her out and transfer park maintenance back to the Shade Tree department, as was expressly stated in a meeting in August of 2022.

180.    Indeed, after Plaintiff was forced to resign in November 2022, the parks were transferred back to Shade Tree.

## **COUNT ONE**

## **HOSTILE WORK ENVIRONMENT UNDER NJLAD**

### **(Against all defendants)**

177.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

178.    By and through its course of conduct as alleged herein, Defendant Borough of Paramus and its agents and named Defendants violated Plaintiff's civil rights and discriminated against the Plaintiff by subjecting Plaintiff to a hostile work environment on the basis of her gender and in violation of the New Jersey Law Against Discrimination ("NJLAD").

179.    Defendants' conduct was intentional, deliberate, willful, and conducted in callous disregard of the protected rights of Plaintiff.

180.    Defendants' policies and practices, as well as their actions, resulted in Plaintiff being subject to an environment that a reasonable person would find to be hostile as a result of the severe and pervasive conduct carried about by the Borough of Paramus and its agents and Defendants on the basis of Plaintiff's gender.

181.    Defendants had no legitimate, nondiscriminatory reason for its treatment of Plaintiff.

182.    Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

183.    Defendant Borough of Paramus facilitated the discrimination by providing no reasonable remedial or correction action after Plaintiff consistently raised concerns about harassment and abuse from male co-workers.

- 34 -

#3305947

184.    Plaintiff is the victim of a hostile work environment based on discrimination because the direct and circumstantial evidence reveal that myriad acts committed against plaintiff over time could not reasonably be tolerated by one situated as plaintiff.

185.    There is no legitimate reason for the commission of the hostile acts occurring against plaintiff or for the Defendants' failure to remedy or prevent such acts.

186.    Defendants conduct individually or when taken cumulatively is highly improper and merits punitive damages above and beyond the limitations imposed by the Punitive Damage Act, which is by law not applicable to a cause of action under the NJLAD.

187.    Plaintiff became physically and emotionally ill as a result of the retaliation and discrimination inflicted upon her referenced herein and was forced to resign as a matter of physical and mental health to extract herself from the hostile environment created by the Borough and Defendants.

188.    As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

**WHEREFORE**, Plaintiff demands judgment against defendants, individually or collectively, for all legal and equitable remedies available including, but not limited to, compensatory and punitive damages, in amounts to be determined at trial, as well as an award of reasonable attorneys' fees and costs, and any further relief that the Court deems just and proper.

## COUNT TWO

## UNLAWFUL PAY DISCRIMINATION AND RETALIATION

### (Against Defendant Borough of Paramus)

#3305947

177.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs of the Amended Complaint as if fully set forth herein.

178.    Plaintiff's gender is a protected trait under the NJLAD.

179.    By and through its course of conduct as alleged herein, Defendant Borough of Paramus and its agents and Defendants discriminated against the Plaintiff by refusing to pay her equally on the basis of her gender in violation of N.J.S.A. 10:5-12 and N.J.S.A. 34:11-56.2.

180.    During her employment, Plaintiff performed work that was substantially equal to work performed by male employees.

181.    Defendant paid Plaintiff at a rate of compensation that was substantially less than the rates it paid male employees to whom she was similarly situated for substantially similar work.

182.    The pay discrimination continued despite Plaintiff's repeated requests for equal pay.

183.    Defendant retaliated against plaintiff because she engaged in such protected activity by allowing and fostering an environment of unwarranted criticism, excessive and superfluous oversight, and day-to-day verbal and psychological abuse.

184.    Plaintiff has suffered substantial economic losses, severe emotional distress and other damages as a result of Defendant's discriminatory actions.

185.    Upper management of Defendant either participated in, or was willfully indifferent toward, the unlawful discriminatory conduct.

186.    Defendant's conduct was intentional, deliberate, willful, and conducted in callous disregard of the protected rights of Plaintiff.

187.    Defendant's policies and practices resulted in Plaintiff being subject to disparate treatment on the basis of sex.

#3305947

188.    Defendant subjected Plaintiff to an adverse employment action by paying her less than similarly situated male employees and by ignoring hostile and aggressive conduct directed toward her in the workplace.

189.    Defendant had no legitimate, nondiscriminatory reason for its refusal to pay Plaintiff in a range of similarly situated male employees. Defendant instead paid male employees larger salaries.  Plaintiff was not fairly compensated as a direct and proximate result of her gender.

190.    Defendant's unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

191.    As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

**WHEREFORE**, Plaintiff demands judgment against defendant for all legal and equitable remedies available including, but not limited to, compensatory and punitive damages, in amounts to be determined at trial, as well as an award of reasonable attorneys' fees and costs and any further relief that the Court deems just and proper.

## COUNT THREE

## AIDING & ABETTING VIOLATIONS OF THE NJLAD

### (Against all defendants)

177.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

178.    Plaintiff's gender is a protected trait under NJLAD.

179.   Plaintiff was subjected to Defendants' verbal, visual and physical behaviors that constituted harassment, abuse, hostile environment and discrimination because of her protected trait.

180.   The harassment, abuse, hostile environment and discrimination set forth herein would not have occurred but for Plaintiff's protected trait.

181.   All harassment, abuse, hostile environment and discrimination described herein was sufficiently severe or pervasive enough to make a reasonable person in Plaintiff's position believe that the conditions of her position were altered and that the environment was intimidating, hostile, or abusive.

182.   All of the harassment, abuse, hostile environment and discrimination claimed herein was unwelcome and was continuous, regular, and ongoing such that it is all actionable under the continuing violation doctrine.

183.   Defendants created, promoted, and fostered a discriminatory, harassing, and abusive atmosphere, and they each participated in, allowed, promoted, aided and abetted actions against Plaintiff that consisted of harassment, abuse, hostile environment and discrimination based on protected traits.

184.   NJLAD prohibits conduct that aids or abets unlawful discrimination and harassment.

185.   At all relevant times hereto, Defendants were decision makers with regard to Borough operations and failed to take prompt, appropriate, and/or reasonable remedial measures to prevent, stop, and remedy the harassment, abuse, hostile environment and discrimination aimed at Plaintiff.

#3305947

186.     At all relevant times hereto, Defendants knowingly and substantially assisted themselves and one another in violations of NJLAD.

187.     At all relevant times hereto, Defendants were aware of their role in the overall, illegal, unlawful activity at the time that the aforesaid conduct occurred.

188.     As a result of the conduct set forth herein, Defendants are subject to individual liability pursuant to the NJLAD.

189.     The aforesaid acts of Defendants in aiding and abetting harassment, abuse, hostile environment and discrimination based on Plaintiff's protected traits violated her rights under NJLAD, causing her harm.

**WHEREFORE**, Plaintiff demands judgment against defendants, individually or collectively, for all legal and equitable remedies available including, but not limited to, compensatory and punitive damages, in amounts to be determined at trial, as well as an award of reasonable attorneys' fees and costs and any further relief that the Court deems just and proper.

## COUNT FOUR

## UNLAWFUL RETALIATION UNDER NJCEPA

### (Against all defendants)

1.     Plaintiff repeats each and every allegation of the preceding paragraphs of the Complaint as if fully set forth herein.

2.     Defendants took adverse employment action against Plaintiff because she disclosed contumacious and actionable conduct which she reasonably believed was in violation of a law, or a rule or regulation promulgated pursuant to law.

3.     Defendants retaliated and continued such behavior after Plaintiff filed a grievance reporting violations of Borough policies, contractual agreements, and existing law.

#3305947

4.     Defendants' actions constitute a violation(s) of the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1, et seq.

5.     Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

6.     As a direct and proximate result of Defendants' discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

**WHEREFORE**, Plaintiff demands judgment against defendants, individually or collectively, for all legal and equitable remedies available including, but not limited to, compensatory and punitive damages, in amounts to be determined at trial, as well as an award of reasonable attorneys' fees and costs and any further relief that the Court deems just and proper.

## COUNT FIVE

## POST-COMPLAINT RETALIATION

### (Against John Does 1-10)

7.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs of the First Amended Complaint as if fully set forth herein.

8.     Plaintiff filed her Complaint on December 27, 2022 and served the Borough on December 29, 2022.

9.     On information and belief, on January 3, 2023, an agent of the Borough sent a text message to Paramus Mayor Christopher DiPiazza and Plaintiff that stated, "Let us bury Megan. I want this case[.]"

10.    On information and belief, the message was intended to harass and intimidate Plaintiff after the filing of her Complaint.

#3305947

11.     On January 26, 2023, Plaintiff's new employer received an email sent from a temporary Google email address referencing this litigation and questioning why Plaintiff was hired, with the apparent intent to portray Plaintiff in a negative light by advising Plaintiff's new employer that Plaintiff engaged a lawsuit against her former employer.

12.     The email message was intended to harass and intimidate Plaintiff after the filing of her Complaint.

**WHEREFORE**, Plaintiff demands judgment against defendants, individually or collectively, for all legal and equitable remedies available including, but not limited to, compensatory and punitive damages, in amounts to be determined at trial, as well as an award of reasonable attorneys' fees and costs and any further relief that the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues in this cause of action.

**DECOTIIS, FITZPATRICK, COLE & GIBLIN, LLP**
*Attorneys for Plaintiff*


By: ___*/s/ Gregory J. Hazley*___


Dated:  July 13, 2023

## CERTIFICATION PURSUANT TO LOCAL RULE 11.2

Gregory J. Hazley, an attorney-at-law of the State of New Jersey, hereby certifies to the best of his knowledge, information, and belief as follows:

- 41 -

#3305947

1.	Except as set forth herein, the matter in controversy in this action is not the subject of any other action pending in any Court or of a pending arbitration or administrative proceeding and no such other action or proceeding is contemplated.

2.	Except for such persons or entities as may be identified and joined in place of the John Doe defendants, to the best of my knowledge as of the present time, there is no other party that should be joined in the within action.

DECOTIIS, FITZPATRICK, COLE
& GIBLIN, LLP
*Attorneys for Plaintiff*

By:	*/s/ Gregory J. Hazley*

Dated:  July 13, 2023

**<u>VERIFICATION OF COMPLAINT</u>**

    Megan Schaffer_____, of full age, does hereby certify as follows:

    1.  I have read the foregoing Verified Complaint and am familiar with the contents thereof.

    2.  To the best of my personal knowledge and belief, all of the facts set forth in said Verified Complaint are true and correct, except such statements which are qualified as being made upon information and belief.

    I hereby certify that the foregoing statements are true and correct and that if any of such statements are willfully false I am subject to punishment.

*Megan Schaffer*

_____
Megan Schaffer

Dated: *July 11, 2023*

- 43 -

#3305947